**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 17-02276-MJ-JG**

**UNITED STATES OF AMERICA**

**vs.**

**DANIEL JOHN PYE,**

**Defendant.**

_____/

**GOVERNMENT'S MOTION FOR REVOCATION**
**OF MAGISTRATE JUDGE'S ORDER OF BOND**

Pursuant to 18 U.S.C. § 3145, the United States of America, by and through the undersigned Assistant United States Attorney, hereby files this motion for revocation of the order of bond set by the Magistrate Court in the Western District of Arkansas during the March 1, 2017, pretrial detention hearing as to the Defendant, Daniel John PYE.

**I.      PROCEDURAL HISTORY**

On February 28, 2017, PYE was arrested pursuant to an arrest warrant issuing by way of complaint, charging him with travel in foreign commerce with the purpose of engaging in illicit sexual conduct with a minor, in violation of Title 18, United States Code, Section 2423.    The complaint was filed in the Southern District of Florida; PYE, who currently resides in Arkansas, was arrested in Texarkana, Arkansas.    On March 1, 2017, PYE had an initial appearance in the Western District of Arkansas, and was appointed local counsel to handle the removal, identity, and detention hearings.    After waiving identity and removal hearings, PYE requested a detention hearing in the Western District of Arkansas.    Pursuant to the rebuttable presumption, established in Title 18, United States Code, Section 3142(e)(3)(E), that the defendant is a danger to the

1

community and a risk of flight, the United States requested that PYE be held with no bond pending

trial.   The pre-trial detention hearing was held on March 1, 2017, before the duty magistrate judge

in the Texarkana Division, Magistrate Judge Barry A. Bryant.[1]   That matter was assigned a

Western District of Arkansas case number of 4:17-mj-4002-BAB.

After conducting a pretrial detention hearing, the Magistrate Judge denied the United

States' request for pre-trial detention and set a $5,000 personal surety bond for PYE with zero co-

signors.   PYE's conditions of release were as follows: (1) may not commit any offense in

violation of federal, state, or local law; (2) must immediately advise the court, defense counsel,

and the U.S. attorney in writing before any change in address; (3) must appear at all proceedings

as required; (4) a $5,000 unsecured signature bond with no sureties; (5) shall report to pre-trial

services; (6) must maintain or actively seek employment; (7) may not obtain a passport; (8) travel

is restricted to the Western District of Arkansas, Bowie County, Texas, and the Southern District

of Florida; (9) avoid all contact, directly or indirectly, with any persons who are or who may

become a victim or witness in the subject investigation, as well as any parent or student PYE has

had contact with since 2012; (10) refrain from possessing a firearm, destructive device, or other

dangerous weapons; (11) refrain from excessive use of alcohol; (12) refrain from use or possession

of controlled substances; (13) submit to pretrial controlled substance testing; (14) participate in a

program of inpatient or outpatient abuse therapy and counseling, if deemed appropriate by pretrial

services; (15) a curfew as directed; (16) no contact with minors excluding his own children; (17)

no use of the internet without permission from probation ; and (18) GPS monitoring.   4:17-mj-

---

[1] The undersigned attorney was not present at the detention hearing in Arkansas and, thus, is relying upon a
summation of the events as related to the undersigned by the Assistant United States Attorney who handled the
matter in Texarkana, WDAR AUSA Amy Driver.   The United States has requested a transcript of the events be
provided in an expedited manner, but has not received the transcript or a date by which to expect completion.

04002-BAB, Docket Entry 10.   The Assistant United States Attorney requested that the Magistrate Judge stay his ruling to allow time for this Motion to be drafted and ruled upon, but the Magistrate Judge did not issue such a stay, and informed the Government that PYE would be released at approximately noon on Thursday, March 2, 2017, unless otherwise ordered.   The United States now moves this Court, as the on-duty District Court in the jurisdiction of original jurisdiction, to (1) stay the Magistrate Judge's ruling and order PYE detained pending the outcome of this motion,[2]  and (2) revoke the imposed bond and detain PYE prior to trial.

## II.   **FACTUAL BACKGROUND**

On April 14, 2015, an individual contacted the national HSI tip line, and stated that an individual named "John Daniel Pye" had sexually abused a minor female while working at an orphanage in Haiti from 2008 through 2012.   In late May of 2015, this information was forwarded to HSI's Miami Office.

Through an examination of travel records and law enforcement databases, "John Daniel Pye" was identified as PYE, an American citizen, born in 1981.   Through database queries, law enforcement identified over 40 separate flights that PYE took from commercial airports, including both Miami International Airport and Fort Lauderdale International Airport, in the Southern District of Florida, to Haiti.   These flights occurred between July of 2004 and September of 2013.

On June 1, 2015, law enforcement spoke with the tip-line caller.   The caller stated that she had received information about PYE from an American married couple – Witness 1 and Witness 2 – who had previously worked with PYE as missionaries at an orphanage in Haiti.   The tip-line

---

[2]  Given that PYE has not been appointed counsel in the Southern District of Florida, should the Court stay the ruling of the Magistrate Judge in the Western District of Arkansas, as requested herein, this will have the practical effect of maintain PYE's detention until at least his first appearance in the Southern District of Florida and appointment of counsel.

caller informed law enforcement that the couple had told her that three separate females in Haiti had alleged that they were sexually abused as minors by PYE. Law enforcement identified Witness 1 and Witness 2, made contact with them, and interviewed them regarding PYE's activities in Haiti.

Witness 1 and Witness 2 are United States citizens who have worked in multiple orphanages in Haiti. According to Witness 1 and Witness 2, in approximately 2005 or 2006, PYE began running an orphanage in Jacmel, Haiti. The orphanage was affiliated with an organization called "Haitian Children's Home" (hereinafter, "HCH"). PYE took over the orphanage from a Canadian male, referred to herein as Witness 3.[3]

In August of 2006, Witness 1 and Witness 2 began periodically working with PYE at HCH, and in 2009, Witness 1 and Witness 2 moved to Jacmel, Haiti. A financial conflict arose between the couple and PYE, and PYE was ultimately fired by the board of HCH. PYE continued running the orphanage in Jacmel with alternative funding.

Following PYE's dismissal from HCH, Witness 1 and Witness 2 had little interaction with PYE or the children at PYE's orphanage. According to Witness 1 and Witness 2, in approximately 2012, PYE was imprisoned in Haiti, for reasons unknown to your affiant, at which point some of the children from the orphanage reconnected with Witness 1 and Witness 2. In 2013, PYE left Haiti and returned to the United States for an extended period of time, apparently having ceased any long-term, within-country work in Haiti.

In April of 2015, Witness 1 was talking about PYE with an adult who had lived in PYE's orphanage as a child, Witness 4. Witness 4 told Witness 1 that PYE had sexually abused a minor

---

[3] Law enforcement located and interviewed Witness 3 telephonically. He advised law enforcement that he had transferred the operation of the orphanage to PYE in 2006.

Haitian female, referred to herein as Minor Victim 1.

After learning about this abuse from Witness 4, Witness 1 spoke with Minor Victim 1 and her mother.[4]   Minor Victim 1 informed Witness 1 that she had been sexually abused by PYE and that PYE had also molested two other females while they were children living at the orphanage, Minor Victim 2 and Minor Victim 3.   Minor Victim 1's mother, who worked at the orphanage, stated that she confronted PYE and that PYE had dismissed her from her employment at the orphanage while simultaneously making monetary payments to her.   Minor Victim 1's mother also said that a gynecological examination had been done on Minor Victim 1.   Witness 1 later informed law enforcement that the doctor who performed this gynecological exam was named Christian Martinez, and that he worked in Jacmel.

Witness 1 and Witness 2 identified a number of other individuals who had contact with PYE in Haiti and the United States, and law enforcement began to interview them.   One of these individuals, Witness 5, is a United States citizen currently residing in North Carolina.   Witness 5 informed law enforcement that he/she originally met PYE in approximately 2007, while Witness 5 and other members of Witness 5's church were on a missionary trip to Haiti.   In the summer of 2009, Witness 5 and PYE both attended a religious conference in Kentucky.   While at the conference, Witness 5 shared a room for one week with PYE.

Witness 5 stated that while at the conference in Kentucky, Witness 5 and PYE began to discuss marital problems that PYE was experiencing.   According to Witness 5, PYE stated words to the effect of: "It's made things worse because I've had an inappropriate relationship with one

---

[4] Orphanages in Haiti do not, strictly speaking, house only orphans.  Frequently, Haitian orphanages run by missionary groups or aid organizations will provide housing, food, education and vocational training for under-privileged children, regardless of whether or not their parents are living.  Oftentimes, children will reside at the orphanages well-into their adulthood, assisting in the upbringing of younger children.

of the kids."   PYE mentioned the child's first name, and Witness 5 recognized the name as one of the children who resided at the orphanage in Haiti.[5]   When Witness 5 expressed concern at PYE's statement, PYE immediately told Witness 5 that he meant only that he played with the child to avoid spending time with his wife.   After thinking more about the conversation, Witness 5 contacted PYE by phone a few weeks later to ask him further questions about the "inappropriate" relationship.   PYE immediately became defensive and stated words to the effect of: "It was my bad to have trusted you."

Law enforcement also spoke with Witness 6, a United States citizen currently residing in Pennsylvania.   He occasionally worked with PYE in Haiti over the course of approximately five years during the 2000s.   During a seven-month period in either 2008 or 2009, Witness 6 worked for PYE at the orphanage assisting with maintenance and transportation.

Witness 6 informed law enforcement that he and PYE took children from the orphanage to the beach and tried to teach them to float in the water.   Witness 6 recalled that, on one occasion, PYE was teaching one of the nannies' daughters to float, but could not recall the specific girl, although he did state that the girl was approximately 11 or 12 years old.   Witness 6 recalled seeing PYE touching the girl's pubic area, posterior, and breast area, and believed that it was inappropriate.

Law enforcement traveled to Haiti in 2015 to speak with some of the victims and witnesses identified during the course of the investigation.   A forensic interviewer spoke with Minor Victim 1, who was twelve (12) years old at the time of the interview and still resides in Haiti.   Minor Victim 1 told the forensic interviewer that when she was approximately six- or seven-years old,

---

[5]  Law enforcement subsequently identified this child, Minor Victim 5, who still resides at the orphanage and in 2009 was approximately 12 years old.   As discussed below, Minor Victim 5 has not been interviewed by law enforcement.

and living at PYE's orphanage, PYE began to molest her.   PYE would insert his finger inside Minor Victim 1's vagina, and also had Minor Victim 1 touch his penis.   This conduct continued for a period of years, until Minor Victim 1 was approximately eight to ten years old.

In a follow-up interview that took place on a subsequent trip to Haiti, law enforcement again spoke with Minor Victim 1, who confirmed the statements she had previously made to the HSI forensic interviewer, as described above.   Minor Victim 1 additionally stated that PYE had forced her to perform oral sex on him on multiple occasions.   She also stated that she had been brought to the hospital because PYE had put his fingers inside her vagina, and that her mother was fired after this incident.   She said PYE had sexually abused her every day, whether his wife was home or not, beginning in 2008, when she was approximately six (6) years old, and ending after her visit to the doctor, in 2011.

Also in 2015, the forensic interviewer spoke with Minor Victim 2, who was eighteen (18) years old at the time of the interview and still resides in Haiti.   Minor Victim 2 informed the forensic interviewer that she recalled one occasion when PYE pushed her swimsuit aside and inserted his finger into her vagina.   Minor Victim 2 did not recall exactly when this incident occurred, but stated that it happened when she was under the age of 12, prior to approximately 2009.   Minor Victim 2 also recalled observing Minor Victim 1 perform oral sex on PYE when Minor Victim 1 was approximately seven or eight years old.   Minor Victim 2 told the forensic examiner that Minor Victim 1's mother overheard Minor Victim 2 discussing the sexual activity between PYE and Minor Victim 1, and that Minor Victim 1's mother confronted PYE; after the confrontation, Minor Victim 1 was taken to the doctor.   Minor Victim 2 also informed the forensic examiner that she had observed PYE having sex with Minor Victim 4 when Minor Victim 4 was approximately 12 to 14 years of age.

In a follow-up interview that took place on the subsequent trip, law enforcement again spoke with Minor Victim 2.   Minor Victim 2 confirmed statements she had made to the HSI forensic interviewer in August of 2015 regarding how PYE would touch her vagina when they were at the beach swimming.   Minor Victim 2 additionally stated that on multiple occasions, both at the beach and within the orphanage, PYE touched her breasts and vagina.   This occurred when she was approximately eight to nine years old, in either 2004 to 2005.

During the same 2015 trip, the forensic interviewer spoke with Witness 4, who grew up in the orphanage and lived there throughout the time that PYE ran the orphanage, and had originally provided the information regarding Minor Victim 1 to Witness 1.   Witness 4 described an incident in which PYE believed that everyone was at church, but Witness 4 had in fact remained at the orphanage, and he witnessed Minor Victim 1 performing oral sex on PYE, when Minor Victim 1 was approximately seven or eight years old.   Based on Minor Victim 1's age, this would have been in either 2009 or 2010.

As part of this investigation, law enforcement obtained travel records from Customs and Border Protection related to PYE's travel.   PYE's name and date of birth were identified on flight manifests for numerous flights leaving from Miami International Airport and Fort Lauderdale International Airport, both in the Southern District of Florida, and arriving in Port-au-Prince, Haiti. Specifically, on October 27, 2008, October 5, 2009, May 14, 2011, and November 8, 2011, PYE departed from Miami International Airport on route to Port-au-Prince.

Based on information obtained during the investigation, law enforcement sought and received authorization to search and seize the contents of the American Online email account DPYE316@aol.com, which was identified as PYE's email account.   As a result of that search warrant, American Online provided, among other information, the following results [all *sic*]:

8

a. An email dated January 16, 2012, from PYE, to an identified email address, titled "[Minor Victim 1's mother] situation."   The email stated, in part, "[Minor Victim 1's mother] was fired on January 10, 2012, for lack of respect, spreading lies, gossip and acting harshly towards the children in our home.   It started back in November when [PYE's wife] and I were in the US, the kids talking about [Minor Victim 1] in a 'relationship' with our male staff.   It escalated and changed several times since then, went to the extreme that they were having sex.   This made [Minor Victim 1's mother] VERY angry."

b. Email dated May 3, 2012, from PYE to four identified email addresses, titled "November 2011 Expense Report."   This email included a summary of expenses from November 2011, including one row that stated, "11/15/2011 Dr. Martinez" "$25" (USD) "Doctor visit for [Minor Victim 1]."

Based on information obtained during the investigation, law enforcement sought and received authorization to search and seize the contents of the Facebook account Danny.Pye.33, which was identified as PYE's Facebook account.   As a result of that search warrant, Facebook provided, among other information, the following content [all *sic*]:

a. Related to the October 27, 2008, travel date:

    i. October 27, 2008: A post from an identified Facebook user on the "wall" of PYE, which stated, "Great to see you and [PYE's wife] today. Travel safely and I'm looking forward to seeing HCH grow…it was really cool to hear your update today."

    ii. October 28, 2008: A post from an identified Facebook user on the "wall" of PYE, which stated, "Hope the trip home was uneventful.   Great seeing you

again and meeting [PYE's wife].   Keep me posted if you need anything."

   iii.   November 8, 2008: A photo posted with the caption "Hanging out at HCH" that appeared to be a photograph of PYE with Haitian children. Additionally, another photo was posted on that same date, with the caption "Pool party with the Haitian Children's Home" that depicted what appeared to PYE with Haitian children in a pool.

a.   Related to the October 5, 2009, travel date:

   i.   September 19, 2009: A private message from PYE to an identified Facebook user, which stated, "We are well. We are heading to the US today actually.   Attending a conference in CO. then to N.C. for meetings. Fun Danny."

   ii.   September 23, 2009: A private message from PYE to an identified Facebook user, which stated, in part, "[Identified Facebook user], we are doing well. [PYE's wife], [PYE's minor child], and I are in CO at a MTI retreat. I won't be returning to Haiti until Oct. 5th."

   iii.   November 3, 2009: PYE posted two "status updates" which stated, "The mitibishi is running!!" and, "now off to eat Speggetti with the kids, one of the best times of the week."

   iv.   November 5, 2009: PYE posted a "status update" which stated, in part, "It is amazing how much more you appreciate your employees when they are not around [Name redacted], I miss you, and the day is just beginning…Looks like I am on driving the kids to school today."

a.   Related to the November 8, 2011, travel date:

i.   October 17, 2011: PYE posted a "status update" which stated, "Really enjoyed sharing at Palmetto First Baptist this morning.  Had a great family dinner with [PYE's wife]'s dad, sister, and family.  Sad to say our goodbyes, but excited to getting closer to the date to head to Haiti."

ii.  November 8: 2011: PYE posted the following "status updates" in order, beginning with the earliest post:

1.  "I sang happy birthday to my [Name redacted] tonight…I am packed!! And ready to head home (Haiti)!! [Name redacted] is taking me to the airport, and I will be home hopefully right before the kids get home from school!!"

2.  "GOING HOME!!!"

3.  "boarding…"

iii. November 9: 2011: PYE posted the following "status updates," which stated, in part:

1.  "So during the boarding in Miami to return to Haiti. I watch President Preval walk up."   "He sat in first class on the commercial flight."

2.  "It is so good to be home. Great night, for the most part.  [Name redacted] and [Minor Victim 5] had a motorcycle accident on the way home from [Minor Victim 5]'s night school.  I immediately rushed over." "I spent the entire night just sitting hearing stories of Haiti life for the past few months, and telling road trip stories…a great night!!"

11

As a result of this investigation, a grand jury subpoena was served on American Airlines to obtain flight travel records for PYE on American Airlines flights.   American Airlines provided a response, stating that they did not have records pre-dating 2011; however, American Airlines did provide, among numerous other travel dates, the below listed flights that PYE had reserved and also boarded:

> a.  May 14, 2011 – American Airlines Flight 687, from Tampa to Miami; American Airlines Flight 809, from Miami to Port-au-Prince.
>
> b.  November 8, 2011 – American Airlines Flight 1236, from Tampa to Miami; American Airlines Flight 1291, from Miami to Port-au-Prince.

In addition, during the course of this investigation, law enforcement has interviewed four individuals who reside in Florida, all currently in their twenties, who knew PYE during PYE's teenage years.   These four individuals, Minor Victim 8, Minor Victim 9, Minor Victim 10, and Minor Victim 11, informed law enforcement that, when they were all between five and seven years of age, they were victims of sexual assault by PYE during the approximate time frame of 1996 through 1999.   There is no apparent connection between Minor Victims 8, 9, 10, and 11 and the victims and witnesses of the Haitian sexual assaults, and the nature of the abuses, particularly as described by Minor Victim 8, are extremely similar to the nature of the abuse as described by Minor Victim 1.

### III.    PRE-TRIAL DETENTION HEARING[6]

On March 1, 2017, a pre-trial detention hearing was held for PYE.   The United States moved for detention as a risk of flight and a danger to the community, and noted that the statutory

---

[6] As mentioned above, no transcript has been provided by the Magistrate Court in Texarkana.   As soon as a transcript is finished, the United States will file it with this Court as a supplement.

presumption applied.   The United States adopted the facts contained within the complaint, which the Magistrate Judge noted he had read and was familiar with.   The United States called Special Agent Emily Shoupe, the case agent from the Southern District of Florida who was the affiant on the criminal complaint affidavit, to testify.   In summary, SA Shoupe confirmed the general facts as related in the complaint.   SA Shoupe also stated that PYE had extensive international travel, including upon private planes.   SA Shoupe confirmed that PYE had, since his return from Haiti, worked almost exclusively with vulnerable children, such as in hospitals, schools, and camps for developmentally disabled children, and that PYE had virtually no fixed residence, moving around to multiple different states and cities without holding down a permanent job.   SA Shoupe further identified that at least three individuals had witnessed PYE sexually assaulting Minor Victim 1.

The assigned officer from the United States Probation Office next testified, stating that detention was appropriate in this case.   She also informed the Court that PYE had attempted suicide in 2015, and has struggled with suicidal ideations for years.   She further identified multiple international contacts that PYE has, such as his father, who resides in Asia, and his aunt and uncle, who reside in the Dominican Republic.

PYE called to the stand his wife, Leann Pye.   Mrs. Pye told the Court that PYE had been imprisoned in Haiti because of Witness 1 and Witness 2, who were involved in a land dispute with PYE.   Mrs. Pye further stated that she had seen a document purporting to establish this fact conclusively, but that she did not have the document available for the Court to peruse.   While she had initially stated that she had seen that document in the United States, under cross examination, she changed her story and stated that she had seen the document in Haiti.

The Magistrate Judge denied the United States' request for pretrial detention, stating, among other things, that the minor victims from Bradenton had never gone to the police, and their

allegations were approximately nineteen years old; that Leann Pye was credible, and that Witness 1 and Witness 2 seemed biased against PYE and could have made the entire story up; that the allegations that form the substance of this case are between six and nine years old; that PYE has no criminal history; that PYE's ties to the Western District of Arkansas are short, but strong (the Magistrate Judge did not make a finding relating to PYE's ties to the Southern District of Florida); that, as far as the nature and seriousness of this offense, PYE is presumed innocent; and that while this case presented a close call, he believed release on bond was appropriate.  The Magistrate Judge ordered a $5,000, unsecured signature bond with no sureties that, while requiring a number of conditions, did not include the use of a bail bondsman or other corporate surety requirement. The United States requested a stay on the issuance of the bond for 48 hours, so as to file this Motion for Revocation, but the Magistrate Judge denied the United States' request, and stated that PYE would be released the following day once the GPS ankle-monitor was installed, at or about approximately noon on Thursday, March 2, 2017.   As mentioned previously, the United States now asks this Court to issue a stay of the issuance of bond until the Court can review this matter. Further, the United States respectfully requests this Court to revoke the bond ordered on March 1, 2017, in this case.

## IV.   <u>STANDARD OF REVIEW</u>

"A district court reviews *de novo* a magistrate judge's pre-trial release order." *United States v. Megahed* 519 F. Supp. 2d. 1236, 1241 (M.D. Fla. 2007); *see also United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985). "Review by the district court contemplates an independent consideration of all facts properly before it." *Megahed*, 519 F. Supp. 2d. at 1241.   When a defendant is arrested in one district on charges arising in another district, once the magistrate in the district where the arrest occurs enters a bond order, any appeal must be to the district court in

the district where the charges are pending.   18 U.S.C. §3145; *United States v. Torres*, 86 F.3d

1029 (11th Cir. 1996).

## V.   **LEGAL STANDARD**

The Defendant, charged by complaint with travel in foreign commerce with the purpose of

engaging in illicit sexual conduct with a minor, in violation of Title 18, United States Code, Section

2423, is a danger to the community and a risk of flight and should be detained pending trial.   In

this case, pursuant to 18 U.S.C. § 3142(e)(3)(E), it is statutorily presumed that no condition or

combination of conditions will reasonably assure the appearance of the defendant and safety of the

community given the charges this defendant is facing.   It is the United States' burden to make a

preliminary showing that the defendant committed an act that triggers the presumption.   *Hurtado*,

779 F.2d at 1479.

Pursuant to the Bail Reform Act, this defendant is eligible for pretrial detention because

the offense charged is a felony involving a minor victim.   *See* 18 U.S.C. § 3142(f)(1)(E).   In

order to secure the pretrial detention of a defendant pending trial, the United States must show by

a preponderance of the evidence that the defendant is a risk of flight and by clear and convincing

evidence that the defendant poses a danger to the community. *See United States v. Quartermaine*,

913 F.2d 910, 915-17 (11th Cir. 1990); 18 U.S.C. § 3142(f).   In examining the 18 U.S.C. §

3142(g) factors with respect to this defendant, it is clear that the factors weigh heavily in favor of

detention based on the defendant being both a risk of flight and a danger to the community.

Under Eleventh Circuit case law, once it is determined that the statutory presumption

applies based upon the crime charged, then "the defendant carries the burden of production to

come forward with evidence to rebut the presumption."   *United State v. Quartermaine*, 913 F.2d

910, 916 (11th Cir. 1990).   Although the statutory presumption places a burden of production on

a defendant, the burden of persuasion concerning the dangerousness remains on the government. *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).   The kind of evidence which a defendant must produce to satisfy his burden of production must "suggest that he . . . [is] either not dangerous or not likely to flee if turned loose on bail."   *United States v. Hurtado*, 779 F.2d 1467, 1479 (11th Cir. 1985).   If the defendant produces such evidence, the presumption does not disappear but "remains in the case as an evidentiary finding militating against release, to be weigh[ed] along with other evidence relative to factors listed in section 3142(g)."   *United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).

### VI.   <u>ANALYSIS</u>

#### A.   The defendant has not rebutted the statutory presumptions.

Here, the defendant's evidence that he was not a risk of flight was his ostensible ties to the Western District of Arkansas, a place he has lived for less than one year.   However, PYE's employment in Arkansas, working at a clinic with children, is no longer available to him, as under the Magistrate Judge's current bond, PYE may not have any contact with children.   Further, no analysis of ties to the community where PYE is facing charges, that is, the Southern District of Florida, was proffered beyond the fact that PYE has a brother who lives in Fort Lauderdale.   PYE has never lived in the Southern District of Florida and does not have a job or residence here.   "The relevant community is, of course, the community in which the defendant faces prosecution.   In the federal system, courts look to the ties of a defendant to the judicial district in which the criminal charges have been brought."   *United States v. Rivera,* 90 F. Supp. 2d 1338, 1343 (S.D. Fla. 2000) (Highsmith, J.); *see also United States v. Rodriguez*, No. 11-02454-MJ, 2011 WL 1467221, at *2 (S.D. Fla. Apr. 18, 2011) (Martinez, J.) (same).   Indeed, the evidence offered by the probation officer and PYE's wife during the hearing, that he is suicidal and has attempted suicide at least

once, if anything increases his likelihood of being a flight risk.   *United States v. Krueger,* 2013 U.S. Dist. LEXIS 96053, 6-7 (E.D. Mich. July 10, 2013) ("I further conclude that the Bail Reform Act allows and may, in fact, require me to consider the potential of the Defendant committing suicide in the context of assessing his possibility of non-appearance."); *United States v. Wasendorf*, 2012 U.S. Dist. LEXIS 130910, 2012 WL 4052834, *5 (N.D. Iowa, 2012) ("when considering a risk of nonappearance…the Court may include the risk that a defendant would commit suicide if released).   The Probation office also recommended that PYE be detained pre-trial. Additionally, PYE is facing a statutory maximum term of imprisonment of 120 years, which creates an extraordinary incentive to flee.[7]

With respect to the statutory presumption as to dangerousness, as described in the criminal complaint, PYE has sexually assaulted minor children since the 1990s, and has done so repeatedly. Since his return from Haiti, PYE has worked as a counselor in at least one school and a clinic, as a camp counselor at a camp for children with developmental disabilities, and as a bus driver for juvenile detention students.   He is clearly a continual danger to the community, and has offered no evidence to rebut that presumption.

### B.   The Section 3142(g) factors favor detention.

#### 1.   The nature and circumstances of the offense charged.

Congress has recognized the dangerousness of crimes involving minor victims when it included this offense in the list of crimes eligible for pretrial detention.   18 U.S.C. § 3142(f)(1)(E).

---

[7] PYE is currently charged by complaint with four separate counts of traveling in foreign commerce with the purpose of engaging in illicit sexual conduct with a minor.  Each of these counts has a statutory maximum of thirty years' imprisonment.  Under a preliminary guidelines calculation performed by the undersigned, PYE's offense conduct level is above 43 and a criminal history level of I, which would establish a guidelines range of life.  However, since none of the counts charged carries a statutory maximum term of life imprisonment, by operation of law, the guidelines range automatically becomes the stacked, consecutive terms of imprisonment for each of the offenses of conviction; should he be convicted of all four charged counts, he will be facing a guidelines range of 120 years of imprisonment.

Indeed, it is hard to imagine a crime that is more dangerous than that which involves a defendant traveling to foreign countries to engage in illicit sexual conduct with minors – especially when those minors are residents in an orphanage run by that defendant, such as in this case.   Congress has further recognized that individuals who commit crimes of this nature are often unable to resist committing similar crimes in the future.   *See, e.g.*, Fed. R. Evid. 413, 414.   The fact that the Magistrate Judge stated that, because PYE is presumed innocent, the nature and circumstances of the offense charged should not matter shows a fundamental misevaluation of the factors contained in the Bail Reform Act.   Clearly, PYE is entitled to a robust defense and the presumption of innocence.   However, the purpose of the Bail Reform Act is to assess dangerousness and risk of flight of a particular defendant – and the purpose of looking at the offense charged is to evaluate the dangerous of that defendant with that in mind.   Stating that the presumption of innocence invalidates this prong means that it would never be useful in a bond determination, essentially ignoring the will of Congress.

### 2.    The weight of the evidence against the defendant.

The evidence against PYE is powerful.   There are numerous victims who tell of similar crimes, and the United States intends on offering the testimony of the Bradenton victims pursuant to Federal Rules of Evidence 413 and 414.   Additionally, the statements of the Haitian victims are corroborated by the statements of other Haitian witnesses.   Admittedly, as of yet there is no indictment, but a criminal complaint was signed and executed based on probable cause.

The Magistrate Judge focused on the potential bias of Witness 1 and Witness 2, finding Leann Pye's testimony credible that Witness 1 and Witness 2 were responsible for keeping PYE incarcerated in Haiti, despite the fact that Leann Pye, PYE's wife, is clearly a potentially biased witness and changed her story on the stand under cross examination.   Ultimately, the weight of

18

the evidence in this case is strong.

### 3.     The history and characteristics of the defendant.

PYE stands accused of conducting numerous sexual assaults of minors over multiple years, and evidence which is admissible under Federal Rules of Evidence 413 and 414 establishes that PYE has committed similar acts going back to the 1990s.   It is hard to overstate his dangerousness. Additionally, PYE has extensive foreign travel, relatives in multiple countries, and access to private airplanes, which, as discussed below, establish that he is a flight risk.

### 4.     The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

PYE is facing very serious charges related to the victimization of multiple minor children who were in his care in a Haitian orphanage.   As discussed above and in the criminal complaint, PYE has also maintained communication with individuals who still reside in Jacmel, Haiti, and could potentially communicate with them in an attempt to intimidate witness cooperation. Additionally, PYE is a danger to any community where children live, that is, every community in the United States.   No admonition to have no contact with children would be likely to impress upon a person who is willing to sexually abuse six-year-old girls in a Haitian orphanage.

### 5.     The defendant is a flight risk.

As discussed above, the evidence also establishes that the defendant is a flight risk.   He has never resided in South Florida, has no stable residence or employment, has lived in numerous locations throughout the United States and internationally.   While PYE has no substantial criminal history in the United States, he is facing the potential of 120 years of imprisonment, which, as mentioned earlier, presents an enormous incentive to flee.   And despite the use of electronic monitoring, the United States contends that this too does not mitigate the risk of flight

in this case.   *See Megahed*, 519 F. Supp. 2d. at 1244 ("Neither electronic monitoring nor the GPS system of surveillance defeats the resolute, resourceful, energetic, and non-compliant releasee."). Finally, as discussed above, PYE has attempted suicide before and has acknowledged repeated suicidal ideations.   This too increases his risk of non-appearance; especially when he is confronted with such a significant term of incarceration and the likely concordant damage to his reputation.

## VII.   <u>CONCLUSION</u>

For the reasons explained above, the United States maintains that no condition or combination of conditions will reasonably assure the safety of the community or the defendant's appearance at trial.   *See* 18 U.S.C. § 3142.   The Defendant should therefore be detained pending trial.   Further, the United States believes that the statutory presumption in favor of detention pursuant to 18 U.S.C. § 3142(e)(3)(A) has not been rebutted.

WHEREFORE, the United States requests this Court stay the Magistrate Judge's release order until a review by this Court can be completed, revoke the bond issued in this case, and order the Defendant detained prior to trial.

<p style="margin-left:40%">Respectfully submitted,</p>

<p style="margin-left:40%">WIFREDO A. FERRER<br>
UNITED STATES ATTORNEY</p>

By:     s/ Benjamin Widlanski_____
<p style="margin-left:40%">BENJAMIN WIDLANSKI<br>
Assistant United States Attorney<br>
Court ID No. A5501885<br>
U.S. Attorney's Office - SDFL<br>
99 Northeast Fourth Street, 8th Floor<br>
Miami, Florida 33132-2111<br>
Telephone: (305) 961-9342<br>
Facsimile: (305) 530-7976<br>
benjamin.widlanski@usdoj.gov</p>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2017, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.   Counsel of Record for the Defendant in the Western District of Arkansas was provided a copy of this document via email.

<div align="right">

s/ Benjamin Widlanski
Benjamin Widlanski
Assistant United States Attorney

</div>